JAYME B. SULLIVAN
BOISE CITY ATTORNEY

SCOTT B. MUIR, ISB # 4229
MARY R. GRANT, ISB #8744
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY
150 N. Capitol Blvd.
P.O. Box 500
Boise, ID 83701-0500
Telephone: (208) 608-7950
Facsimile: (208) 384-4454
Email: boca@cityofboise.org

Attorney for City of Boise

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re: | |
| | Case No. 19-01069-jmm |
| WILLIAM E. DEMPSEY, II and AMY D. DEMPSEY. | **Chapter 11** |
| Debtors. | |

## MOTION FOR ORDER RE: AUTOMATIC STAY

COMES NOW, the City of Boise, by and through its attorney of record, and, pursuant to

Federal Rules of Bankruptcy Procedure 9013, moves this Court for an order declaring the

automatic stay inapplicable to the claims and controversies in Ada County Case No. CV01-17-

23686, as between the Plaintiffs thereto, BrunoBuilt, Inc., and the City of Boise and Terra Nativa,

co-defendants of the Debtors herein.  The City of Boise moves this Court to allow that action to

proceed as to the co-defendants, and as grounds states as follows:

      1.      BrunoBuilt, Inc. (BrunoBuilt), an Idaho Corporation, filed a lawsuit against the

**MOTION FOR ORDER RE: AUTOMATIC STAY - 1**

Debtors (sometimes referred to as the Dempseys) in Ada County Case No. CV01-17-23686. BrunoBuilt also filed suit against City of Boise and Terra Nativa, LLP (Terra Nativa) in Ada County Case No. CV01-18-00500. The Court consolidated these two cases under Case No. CV01-17-23686.

2.      After considerations of respective motions for summary judgment, the state magistrate court found that co-defendants City of Boise and Terra Nativa are entitled to summary judgment, as show in **Exhibit A** Memorandum Decision and Order, entered August 26, 2019.

3.      Prior to entry of summary judgment on that order, to settle all pending claims as to co-defendants City of Boise and Terra Nativa, the Debtors herein filed bankruptcy on September 17, 2019, and made notice thereof to the state magistrate court.

4.      The magistrate court then entered an Order Staying Proceedings on September 18, 2019. See the attached **Exhibit B**.

5.      The Order Staying Proceedings was entered because of the operation of the automatic stay under 11 U.S.C. § 362. However, neither City of Boise or Terra Nativa are creditors to the Debtors in the above-entitled action, with standing to pursue relief from the stay as provided for under 11 U.S.C. § 362(d).

6.      The state court claims in Ada County Case No. CV01-17-23686 as between BrunoBuilt and co-defendants City of Boise and Terra Nativa do not affect the claims as between BrunoBuilt and the Debtors or the property of the estate. Both Terra Nativa and the Dempseys stipulate and agree to the same, as evidenced in the Stipulation for Entry of Order, filed with this Motion.

**MOTION FOR ORDER RE: AUTOMATIC STAY - 2**

Accordingly, City of Boise respectfully requests that this Court, immediately and without hearing, enter an Order Allowing State Claims to Proceed as to BrunoBuilt and co-defendants City of Boise and Terra Nativa and enter the proposed order in the form and content filed with this Motion.

DATED this  17th    day of March 2020.

OFFICE OF THE CITY ATTORNEY

SCOTT B. MUIR, Deputy City Attorney
Attorney for City of Boise

**MOTION FOR ORDER RE: AUTOMATIC STAY - 3**

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of March 2020, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which sent a Notice of Electronic Filing to the following persons:

Holly Roark                                          holly@roarklawboise.com
Roark Law Office
950 Bannock Street, Ste. 1100
Boise, ID 83702
Telephone: (208) 536-3638


Brett R. Calhoun                                     ustp.region18.bs.ecf@usdoj.gov
Office of the U.S. Trustee
720 Park Blvd., Suite 220
Boise, ID 83712
Telephone: (208) 334-1300


Don Farley                                           djf@powersfarley.com
Powers Farley, PC
702 W. Idaho St., Suite 700
Boise, ID 83702
Telephone: (208) 577-5100

_____

Mary R. Grant

**MOTION FOR ORDER RE: AUTOMATIC STAY - 4**

Filed: 08/26/2019 12:52:44
Fourth Judicial District, Ada County
Phil McGrane, Clerk of the Court
By: Deputy Clerk - Olson, Maura

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR ADA COUNTY

| | |
|---|---|
| BRUNOBUILT, INC., an Idaho corporation,<br>Plaintiff, | Case No. CV01-17-23686 |
| vs. | MEMORANDUM DECISION AND ORDER |
| WILLIAM DEMPSEY and AMY DEMPSEY,<br>husband and wife; CITY OF BOISE, a<br>municipal corporation; TERRA NATIVA,<br>LLP, an Idaho limited liability partnership,<br>Defendants. | |

THIS MATTER comes before the Court on (1) Plaintiff's Motion for Partial Summary Judgment against William and Amy Dempsey, filed through counsel on May 28, 2019, (2) Defendant Terra Nativa, LLP's Motion for Summary Judgment, filed through counsel on May 28, 2019, (3) Defendants William and Amy Demseys' Motion for Summary Judgment, filed through counsel on June 24, 2019, and (4) Defendant City of Boise's Motion for Summary Judgment, filed through counsel on June 24, 2019.  A hearing was held on July 23, 2019, and the matter was taken under advisement.  The Court concludes that Plaintiff's negligence claims against Terra Nativa, LLP and the City of Boise are barred by the economic loss rule; however, Plaintiff is entitled to recover against the Dempseys for their breach of the construction contract. Accordingly, for the reasons set forth herein, Plaintiff's Motion is GRANTED, Defendants William and Amy Dempseys' Motion is DENIED and the remaining Defendants' Motions are GRANTED.

**EXHIBIT "A"**

## UNDISPUTED FACTS

This is one of several cases that BrunoBuilt, Inc. ("BrunoBuilt") has filed related to a home it built in the Terra Nativa subdivision for William and Amy Dempsey. The crux of all of BrunoBuilt's cases concerns who is responsible for damages that occurred as a result of an unforeseen landslide.

### (1) Approval of the Terra Nativa Development

Over 20 years ago, Terra Nativa, LLP ("Terra Nativa"), Richard Pavelek, and Tim Day (collectively, the "Developers") began the process of developing the Terra Nativa subdivision, which would be located in the East Boise foothills. In 1992, Howard Consultants, Inc. (which is now Strata, Inc.) prepared a Preliminary Soil and Geographic Evaluation of the future site of the Terra Nativa subdivision ("1992 Report").[1] The 1992 Report indicated that the "property was evaluated to preliminarily assess the soil and geologic conditions and evaluate those conditions relative to a planned residential development."[2] The report opined that "the site is suitable for the planned development."[3]

On February 28, 1997, Terra Nativa[4] submitted conditional use and hillside applications to the City of Boise's Planning Department, which were approved by the City of Boise (the "City") a few months later. The City's approval noted that the project fell within the jurisdiction of the

---

[1] Jason Taylor Decl. Ex. H (filed June 24, 2019).
[2] *Id*. at Ex. H, p. 2.
[3] *Id*. at Ex. H, p. 13.
[4] Technically the applicant was "Peregrine Springs Ltd Co." It appears that this entity was Terra Nativa's predecessor.

Memorandum Decision and Order - 2

**EXHIBIT "A"**

city Foothills Ordinance and must comply with all of its requirements. The City was aware of the potential for landslides in the east Boise foothills at the time the Developers submitted their application.[5] The City had implemented hillside ordinances at the time the application was submitted, which were amended and expanded in 2002.[6]

In 1998, the first two phases of the Terra Nativa project were developed (referred to as Nativa Terra Subdivision Nos. 1 and 2). The Developers retained Strata, Inc. ("Strata") to perform geotechnical evaluations for these subdivisions. Strata issued a report on February 20, 1998, which was filed with the City ("1998 Strata Report"). James Rogers ("Rogers"), a geologist, was employed with the City from July 1998 to July 2004. Terry Records ("Records") (another City employee)[7] asked Rogers to review the 1998 Strata Report. Rogers reviewed the report, conducted a site visit, and wrote a memo for Records. In that memo, Rogers opined that the geology section of the 1998 Strata Report was inadequate and did not fully address the geologic complexity of the site. He concluded,

> It is my understanding Kleinfelder has been retained by Boise City to review the use of the clays as structural fill. I would also request you retain them to review

---

[5] *See* Chad Nicholson Decl. Exs. 3—4 (filed July 11, 2019) (draft reports prepared by the Foothills Steering Committee, which recognized potential hazards for building in the foothills include landslides and unstable slopes). A 1973 report by Kenneth M. Hollenbaugh, which was prepared for the Ada Council of Governments (which included the City), recommended that "[e]rection of structures for habitation on active or historically active landslides must be prohibited unless the slide mass is permanently stabilized through the application of engineering techniques." *Id*. Ex. 1, p. 4, ¶ 14 (filed July 11, 2019). James Rogers (a City employee at the time Terra Nativa submitted its application) testified that he participated in the "Hollenbaugh Project" and as a result of his participation, Rogers was aware that landslides were present in the area where the Terra Nativa subdivision was to be built. *Id*. at Ex. 30. Kay Hummel also advised the Hillside Technical Advisory Committee at an October 12, 2000 meeting that the opinion of a "number of geologists" is that "anything east of military reserve has special conditions[.]" *Id*. at Ex. 14.

[6] Both the City and BrunoBuilt assert that the 2002 version of the Boise City Code is controlling in this case.

[7] Records was also a member of the Hillside Technical Advisory Committee, which developed standards and requirements for technical reports that were submitted to the City for homes that were to be constructed in areas regulated by the Hillside Ordinance.

Memorandum Decision and Order - 3

**EXHIBIT "A"**

the adequacy of the Geologic section of this report and make recommendations as to the need for additional or an expanded geologic investigation.[8]

Rogers testified that he also verbally told Records of his concerns, including that the 1998 Strata Report was not stamped or signed by a registered professional geologist.

In 2003, the Developers proposed the development of Nativa Terra Subdivision No. 3/No. 4 (collectively, "Terra Nativa 4").[9]  The Developers again retained Strata to conduct geological and geotechnical assessments of Terra Nativa 4.  On November 13, 2003, Strata issued a geotechnical report ("2003 Strata Report").  The 2003 Strata Report built on and included the 1992 Report and the 1998 Strata Report.  The Developers subsequently submitted the 2003 Strata Report to the City.

On December 19, 2003, Records[10] sent the 2003 Strata Report for review to G. Alexander Rush ("Rush"), a professional engineer working for Kleinfelder Inc. ("Kleinfelder").  In a letter to Rush, Records asked Rush to "review the reports to ensure compliance with the Boise Hillside and Foothills Areas Development Ordinance and the Boise City hillside development guidebook – 'Hillside Developments, Requirements for Technical Reports.' "[11]  Records requested that the engineer "provide the City with comments and opinions on whether the reports are complete, adequately address pertinent geotechnical issues and demonstrate the sites can be safely developed as residential subdivisions."[12]

---

[8] Nicholson Decl. Ex. 30.
[9] "Nativa Terra Subdivision No. 4" is the second phase of "Nativa Terra Subdivision No. 3 Phase 2."
[10] Records was responsible for ensuring that the 2003 Strata Report was received by the City.
[11] Ada County Case No. CV-OC-2016-9068, Terry Records Decl. Ex. A (filed Nov. 30, 2017) (hereafter, "Records Decl.").  The Court takes judicial notice of this Declaration and the attached Exhibit.
[12] Id.

**EXHIBIT "A"**

On January 20, 2004, Rush responded to the City's request with a Third Party Review of Geotechnical Engineering Evaluation Report of Proposed Nativa Terra Subdvision No. 3, which included his comments and recommendations. Strata prepared a response that was dated March 4, 2004. On March 30, 2004, the City issued a preliminary plat approval for Terra Nativa 4, and the property was annexed into the City on May 24, 2004. Rush replied to Strata's response on April 5, 2004. BrunoBuilt submitted an expert declaration from Patrick O. Shires who opined that neither the Strata Report, nor Strata's response, constitute a geological report or reflect that a geological evaluation was completed.[13]

Records testified that he

> relied on the professionals of Strata, Inc., and Kleinfelder, Inc., who wrote and reviewed the reports and did the underlying studies to support their opinions that "the site is suitable from a geotechnical standpoint for the proposed project" and "our field and laboratory data indicate these slopes will remain stable, provided surface and subsurface water is controlled in these areas."
> . . .
>
> The City and myself relied on the third-party review of Kleinfelder, Inc. to determine that through the 2003 Strata Report, the Project Engineer demonstrated that the site limitations identified in B.C.C. § 11-14-08 (Ordinance No. 6119 adopted January 3, 2002) could be overcome in such a manner as to minimize hazard to life, hazard to property, and adverse effects on the safety, use or stability of a public way or drainage channel. The City and myself relied on Kleinfelder, Inc. that the 2003 Strata Report was complete, adequately addressed pertinent geotechnical issues and demonstrated the sites could be safely developed as residential subdivisions. Further, the City and myself relied on Kleinfelder, Inc. to determine that the 2003 Strata Report complied with the Boise Hillside and Foothills Areas Development Ordinance and the Boise City hillside development guidebook — "Hillside Developments, Requirements for Technical Reports."[14]

---

[13] Nicholson Decl. Ex. 32 (hereafter, "Shires Decl.").
[14] Records Decl. at ¶¶ 7, 9.

**EXHIBIT "A"**

Records further testified that he had no knowledge of a pre-existing landslide in the area of the Terra Nativa subdivision or that the area was not conducive to a residential development.[15] However, Rogers provided conflicting testimony that he advised Records about the potential for landslides in the area where the Terra Nativa subdivision was to be built.

On June 5, 2007, the Boise City Council approved the final plat of Terra Nativa 4 subject to compliance with various conditions. On February 5, 2008, Strata submitted a Confirmation of Construction to the Developers confirming that Terra Nativa 4 had been completed in accordance with its geotechnical recommendations.[16] On July 22, 2008, the City's Engineer, John Tensen ("Tensen"), signed the final plat of Terra Nativa 4, acknowledging that the recommended conditions for construction of the subdivision had been satisfied.[17]

On August 26, 2008, the final plat was recorded by the Ada County Recorder's office. At this point, Terra Nativa 4 was ready for the construction of homes; however, the market had collapsed. Once the market began to recover, six lots in Terra Nativa 4 were purchased and construction on these homes began in 2015.

### (2) BrunoBuilt and the Dempseys' Construction Contract

In 2014, William and Amy Dempsey (hereafter, the "Dempseys") purchased Lot 16 in Terra Nativa 4 (238 Alto Via Court). In January 2015, the Dempseys retained Erstad Architects, P.A.

---

[15] *Id.* at ¶¶ 10, 11.
[16] Ada County Case No. CV-OC-2016-9068, John Tensen Decl. ¶ 5 (filed Nov. 30, 2017) (hereafter, "Tensen Decl."). The Court takes judicial notice of this declaration and the attached exhibits.
[17] *Id.* at ¶ 7.

**EXHIBIT "A"**

("Erstad") to provide architectural and engineering services to construct a home on their lot. Erstad hired Materials, Testing & Inspection ("MTI") and Briggs Engineering, Inc. ("Briggs") to perform engineering services.

On July 6, 2015,[18] BrunoBuilt entered into an agreement with the Dempseys to build a custom family home on their lot ("Construction Contract" or "Contract"). The Contract identified the Dempseys as "Owner" and BrunoBuilt as "Contractor." The Recitals stated in part that "Owner desires Contractor to construct a single family home on the Property, and Contractor desires to construct Owner a single family home pursuant to the terms and conditions of this Contract."

The Construction Contract provided that BrunoBuilt would provide a construction loan secured by the property, which would be transferred into BrunoBuilt's name by the Dempseys at the closing of the construction loan (Section 4.1). The Construction Contract also provided that the Dempseys' mortgage lender would pay off the construction loan upon completion of the home. Both parties understood and agreed that BrunoBuilt would transfer title in the property back to the Dempseys at the completion of the construction project, although the Contract did not explicitly state this.

BrunoBuilt agreed to "make reasonable efforts to meet the requirements" imposed by its construction lender (Banner Bank) (Section 8.5). However, the Construction Contract did not require BrunoBuilt to maintain insurance on the property, nor did BrunoBuilt's eventual agreement for its construction loan with Banner Bank specifically require landslide insurance.

---

[18] The contract is dated April 28, 2014 in the first paragraph; however, it was signed by the parties on July 6, 2015.

Memorandum Decision and Order - 7

**EXHIBIT "A"**

Under the Contract, the Dempseys agreed to pay BrunoBuilt $825,000 to construct their home. They also agreed that "The Price shall be modified for additional costs and/or delays caused by Owner in connection with any change order or delay(s) as provided further herein" (Section 3.1).[19]  The Dempseys agreed to assume the risk of any damages associated with unforeseen soil conditions at the property (Section 5.3).   The Dempseys agreed to pay BrunoBuilt for any reasonable expenses BrunoBuilt incurred in connection with "any unusual and/or unforeseen erosion and/or erosion control issues; grading, cut and/or fill issues, soil and/or soil compaction issues; geology and/or rock conditions, hydrologic issues; and/or civil engineering issues" (Section 5.4).   The Dempseys also agreed to a force majeure provision, which provided as follows:

> 7.1 Contractor shall be excused from further performance under this Contract as a consequence of any delays or defaults under this Contract unavoidably caused by the act of any governmental authority, the act of any public enemy, acts of God, nature, weather, war, war defense conditions, strikes, walkouts or other causes beyond the control of Contractor. Contractor shall use best efforts to avoid any such delay or default and shall resume performance under this Contract immediately following any such delay or default, but only if such default or delay does not continue for a period of thirty (30) days or more. If such default or delay does continue for a period of greater than of thirty (30) days, Contractor may declare this Contract terminated. If Contractor's performance is excused hereunder, Owner shall pay to Contractor that portion of the Price earned prior to the onset of the default or delay within ten (10) days of the date performance is excused.

On July 10, 2015, the Dempseys quitclaimed the deed to their lot to BrunoBuilt.  On August 11, 2015, BrunoBuilt obtained a $660,000 construction loan from Banner Bank, pledging the Dempsey home as collateral.  The Construction Loan Agreement between Banner Bank and BrunoBuilt required BrunoBuilt to obtain builder's risk insurance.  BrunoBuilt had insurance

---

[19] The "Final Payment" was due and payable after the home was "substantially complete" subject only to the punch list items and the certificate of occupancy (Section 4.4.).  However, Section 2.2 provides that that "the Project shall be deemed substantially complete upon the date of issuance of a certificate of occupancy from the applicable governmental agency."

**EXHIBIT "A"**

coverage on the Dempsey home until March 28, 2016, when it was inadvertently not renewed. It is unknown whether the insurance BrunoBuilt had on the property would have covered a landslide. However, it is undisputed that Banner Bank did not specifically require BrunoBuilt to obtain landslide coverage.[20]  On July 14, 2016, BrunoBuilt learned that the Dempsey home was not being covered and replacement coverage was obtained.

### (3) Landslide

Around February 2016, the land under portions of the Terra Nativa subdivision began to slide, causing damage to the land and another home near the Dempseys' home. It was initially unclear what was causing the damage to the house; however, it was later determined that the damage was being caused by the reactivation of an historic landslide.

By early April 2016, BrunoBuilt had neared substantial completion on the Dempsey home. However, at this time, the landslide began to affect the Dempsey home and a crack appeared in the roadway and in the front lawn. Water services were cut-off shortly thereafter.

On April 12, 2016, the Dempseys and BrunoBuilt executed Contract Addendum #2, which amended the price of the Contract to $850,000 (from $825,000) "as a result of changes, upgrades and modifications made to original landscape design."

BrunoBuilt hired a surveyor to monitor whether the Dempsey home was being affected by the landslide. The surveyor issued a letter dated April 25, 2016, stating that no movement had been

---

[20] Robert Bruno Decl. in Opp. to Defs.' Mot. for Summ. J. ¶ 12 (filed July 9, 2019).

**EXHIBIT "A"**

detected.  Later that day, Robert Bruno ("Bruno," the president of BrunoBuilt) emailed City of Boise employees' Jason Blais and Jason Taylor regarding obtaining a certificate of occupancy for the Dempsey home.  Bruno testified:

> Shortly thereafter, the City performed a final inspection. Although the City acknowledged that BrunoBuilt had completed all work typically necessary to obtain a certificate of occupancy, it refused to issue the certificate due to ongoing concerns over the landslide. Nonetheless, City Building Official Jason Blais advised me that the City would likely issue a certificate of occupancy if I would agree to perform certain additional work. The scope of the additional work was not discussed during the inspection.[21]

On May 5, 2016, the Ada County Highway District ("ACHD") emailed homeowners that were building in the Terra Nativa subdivision and advised them that it was closing a portion of North Alto Via Court and excluding it from the ACHD highway system.  The decision prevented access to homes that were affected by the slide, but it did not prevent access to the Dempsey home.

On May 8, 2016, the Dempseys and BrunoBuilt executed Contract Addendum #3, which extended the construction completion date from May 8, 2016 until May 30, 2016, "to cover various delays."[22]

On May 25, 2016, Mr. Dempsey emailed Bruno and stated, "We are scheduled to close on Friday at 4 pm assuming all goes well with the City of Boise and the CO."[23]  Bruno testified the closing

---

[21] Robert Bruno Decl. ¶ 19 (filed May 28, 2019).
[22] *Id*. at Ex. H.
[23] *Id*. at Ex. J.

**EXHIBIT "A"**

did not occur because the City "still had not identified the work that needed to be performed to obtain the certificate of occupancy."[24]

On June 9, 2016, Bruno and his former attorney met with City officials. During that meeting the City advised it would issue a certificate of occupancy upon the completion of several items, including

> a) reasonable assurance from a qualified engineer that the dwelling at the Lot was not structurally compromised and, as constructed or with the installation of helical piers and/or possibly a retaining wall(s), was not reasonably likely to be structurally compromised by the landslide occurring downhill from the Lot;
> b) permanent utility connections;
> c) approval of an alternate path for sewer and drainage; and
> d) confirmation that Mr. Dempsey was aware of these terms and did not object.[25]

Mr. Dempsey emailed the City confirming that he and his family still intended to live in the house assuming it was safe for occupancy.[26]

However, about a month later, the Dempseys had a change of heart. On July 18, 2016, the Dempseys emailed Bruno as follows:

> After many sleepless nights, and anguish on this matter, we have come to the conclusion that we need to move on with our lives, at a minimum for the sake of our children, and that the house on Alto Via, as this time is not a part of that. No certificate of occupancy has been issued and we do not feel comfortable closing on the house with all of the ongoing issues. We cannot have a massive crevasse in our yard, a crumbling street, no fire protection and the Boise School District will no longer provide bussing service for our kids. We will have no neighbors, landscaping, or resolution in sight for the next few years, including the unknown of if the slide will stop.
>
> Once all of the lawsuits are settled, remediation work is done (wheter thatmeans all the houses are demolished or the hillside is repaired and everyone moves

---

[24] *Id*. at ¶ 23.
[25] *Id*. at ¶ 24, Ex. K.
[26] *Id*.

**EXHIBIT "A"**

back), the street is repaired and added to ACHD and the fire departments area of coverage, we would consider acquiring the house.

Robert, I regret that this project has become such a mess, but at this point we do not see how anyone in our position could purchase a home with these kinds of terrible issues. We removed our personal items and the appliances we paid for and put the key back where you placed it.[27]

Bruno responded that he would continue to move forward and work with the City to acquire a certificate of occupancy and he reminded the Dempseys of their obligations under the Contract with him. As of July 18, 2016, the Dempseys had made approximately $102,399.09 in progress payments to BrunoBuilt.[28]

Since litigation has ensued, BrunoBuilt's expert has identified damage to the Dempsey home as a result of the landslide, including cracks in the driveway, foundation, front porch stoop, and in the stucco. On July 22, 2017, BrunoBuilt ceased its efforts to obtain a certificate of occupancy once the Dempseys' attorney reiterated their repudiation of the Contract.

### (4) Litigation

On December 19, 2016, BrunoBuilt filed suit against Strata, Kleinfelder, and various engineers and engineering firms alleging negligence related to their failure to identify the landslide at the Terra Nativa subdivision (Ada County Case No. CV01-16-22915) ("Kleinfelder Case"). On September 19, 2017, BrunoBuilt filed suit against Strata and various Strata employees (Ada County Case No. CV01-17-17395) ("Strata Case"). Both of these cases were presided over by

---

[27] *Id*. at Ex. M.
[28] William Dempsey Decl. ¶ 17 (filed June 24, 2019).

**EXHIBIT "A"**

Judge Hippler.  In both of these cases, Judge Hippler held that a majority of the claims by BrunoBuilt were barred under the economic loss rule.

On December 27, 2017, BrunoBuilt filed the instant action against the Dempseys alleging (1) breach of contract and (2) unjust enrichment.

On January 5, 2018, BrunoBuilt filed a separate action against the City and Terra Nativa, alleging (1) negligence against Terra Nativa and (2) gross negligence against the City.  As against both the City and Terra Nativa, BrunoBuilt alleges that it has suffered damages in the form of increased costs of construction, including additional testing and inspection, increased interest costs, and the cost of constructing a retaining wall.  It also alleges damages for the lost market value of the Dempsey lot and home.

On April 2, 2018, this Court consolidated BrunoBuilt's cases against the Dempseys, the City, and Terra Nativa.

On July 13, 2018, BrunoBuilt filed an action against Randy Richardson, Richardson Insurance Services, Inc., and Auto-Owners Insurance Company (Ada County Case No. CV01-18-12862). That lawsuit alleges negligence for the insurance agent's failure to inform BrunoBuilt about landslide coverage.

**EXHIBIT "A"**

## LEGAL STANDARD

Summary judgment may be entered only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  I.R.C.P. 56(a).  The Court "liberally construes the facts and existing record in favor of the non-moving party" in making such determination.  *Hall v. Forsloff*, 124 Idaho 771, 773, 864 P.2d 609, 611 (1993).  "If reasonable people could reach different conclusions or inferences from the evidence, the motion must be denied."  *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 238, 108 P.3d 380, 385 (2005).  Moreover, "[a] mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue for purposes of summary judgment."  *Stafford v. Weaver*, 136 Idaho 223, 225, 31 P.3d 245, 247 (2001) (citations omitted).

The moving party bears the initial burden of proving the absence of a genuine issue of material fact, and then the burden shifts to the nonmoving party to come forward with sufficient evidence to create a genuine issue of material fact.  *See Sanders v. Kuna Joint School Dist.*, 125 Idaho 872, 874, 876 P.2d 154, 156 (1994).  When the nonmoving party bears the burden of proving an element at trial, the moving party may establish a lack of genuine issue of material fact by establishing the lack of evidence supporting the element.  *Dunnick v. Elder*, 126 Idaho 308, 311, 882 P.2d 475, 478 (Ct. App. 1994).

A party opposing a motion for summary judgment "may not rest upon mere allegations in the pleadings, but must set forth by affidavit specific facts showing there is a genuine issue for trial."  *Gagnon v. W. Bldg. Maint., Inc.,* 155 Idaho 112, 114, 306 P.3d 197, 199 (2013).  Such evidence

**EXHIBIT "A"**

may consist of affidavits or depositions, but "the Court will consider only that material . . . which is based upon personal knowledge and which would be admissible at trial." *Harris v. State, Dep't of Health & Welfare*, 123 Idaho 295, 298, 847 P.2d 1156, 1159 (1992). If the evidence reveals no disputed issues of material fact, then only a question of law remains on which the court may then enter summary judgment as a matter of law. *Purdy v. Farmers Ins. Co. of Idaho*, 138 Idaho 443, 445, 65 P.3d 184, 186 (2003).

The mere fact that the parties have filed cross motions for summary judgment does not necessitate a finding that there are no genuine issues of material fact; however, "[w]here the parties have filed cross-motions for summary judgment relying on the same facts, issues and theories, the parties effectively stipulate that there is no genuine issue of material fact that would preclude the district court from entering summary judgment." *Intermountain Forest Mgmt., Inc. v. Louisiana Pac. Corp.*, 136 Idaho 233, 235, 31 P.3d 921, 923 (2001). "The fact that the parties have filed cross-motions for summary judgment does not change the applicable standard of review, and this Court must evaluate each party's motion on its own merits." *Id.* Only BrunoBuilt and the Dempseys' Motions are cross motions for summary judgment.

## ANALYSIS

The City and Terra Nativa both moved for summary judgment on the basis that the claims against them are barred by the economic loss rule and they urge this Court to adopt Judge Hippler's reasoning set forth in the Kleinfelder and Strata cases. The City also asserts it owed no duty to BrunoBuilt to ensure that the property was not subject to natural hazards or disasters and

**EXHIBIT "A"**

that it is entitled to qualified immunity because it was not grossly negligent in approving the Terra Nativa subdivision.  Terra Nativa also argues that BrunoBuilt's claims against it are barred by the statute of limitations for professional negligence, because BrunoBuilt is attempting to hold it vicariously liable for professional engineers' allegedly deficient reports.

BrunoBuilt responds that this Court should follow the reasoning of Judge Moody in Ada County Case No. CV-OC-2016-9068 ("Sericati Case"), which found that other homeowners in the Terra Nativa subdivision were not barred by the economic loss rule from suing for negligence. BrunoBuilt asserts that the City owed a duty imposed by its own ordinances and that at the very least there is a genuine issue of material fact regarding whether the City was grossly negligent. BrunoBuilt also argues that its claim against Terra Nativa is subject to the four year statute of limitations because its claim is not a professional negligence claim.

BrunoBuilt and the Dempseys filed cross-motions for summary judgment.  BrunoBuilt argues it is entitled to summary judgment because under the plain terms of the Contract, the Dempseys assumed the risk of unforeseen site and adverse soil conditions, the Dempseys wrongfully repudiated the Contract, and it is entitled to its attorney fees.

The Dempseys contend that its performance was excused due to BrunoBuilt's breaches of the Contract, including its failure to maintain proper insurance on the property.  The Dempseys also argue that its performance was not due because BrunoBuilt failed to achieve substantial completion of the home, the burden of risk did not shift to them, and their performance was excused by the doctrine of frustration of purpose.

Memorandum Decision and Order - 16

**EXHIBIT "A"**

**(1) BrunoBuilt's negligence claims against Terra Nativa and the City are barred by the economic loss rule.**

"The economic loss rule is a judicially created doctrine that applies to negligence cases." *Path to Health, LLP v. Long*, 161 Idaho 50, 56, 383 P.3d 1220, 1226 (2016). The Supreme Court has applied the rule to cases "involving the purchase of defective personal property and real property." *Brian & Christie, Inc. v. Leishman Elec., Inc.*, 150 Idaho 22, 26, 244 P.3d 166, 170 (2010). "Unless an exception applies, the economic loss rule prohibits recovery of purely economic losses in a negligence action because there is no duty to prevent economic loss to another." *Blahd v. Richard B. Smith, Inc.*, 141 Idaho 296, 300, 108 P.3d 996, 1000 (2005). "Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co*., 97 Idaho 348, 351, 544 P.2d 306, 309 (1975). However, economic loss does not include damages from physical harm to person or property other than that which is the subject of the transaction. *Stapleton v. Jack Cushman Drilling & Pump Co. Inc*., 153 Idaho 735, 742, 291 P.3d 418, 425 (2012). Thus, where, as here, property damage is alleged, "it is the subject of the transaction that determines whether a loss is property damage or economic loss, not the status of the party being sued." *Blahd*, 141 Idaho at 301, 108 P.3d at 1001. The "subject of the transaction" is defined by the subject matter of the contract. *Aardema v. U.S. Dairy Systems, Inc*., 147 Idaho 785, 791, 215 P.3d 505, 511 (2009) (subject matter of contract for the purchase, installation and operation of a milking system was the milking system, not the cows, and actual physical damage to cows not an economic loss).

**EXHIBIT "A"**

Here, the issue is whether the subject of the transaction was the purchase of defective property or the rendition of negligent services, and whether the damages sought by BrunoBuilt are due to physical injury to property other than the subject of the transaction. Here, BrunoBuilt acquired title to defective property (i.e. a lot that was more or less sitting on top of a landslide) when it entered into a Construction Contract to build the Dempsey home. BrunoBuilt relies on *Brian and Christie* for its contention that the economic loss rule does not bar its negligence claims, however, that case is readily distinguishable, because the contract at issue involved providing electrical services during the remodel of an existing building – not the sale or transfer of a product.

In *Brian and Christie*, the Supreme Court held that a restaurant owner was not barred by the economic loss rule from suing a subcontractor for performing negligent electrical work, which resulted in a fire that damaged the restaurant building. *Brian & Christie, Inc. v. Leishman Elec., Inc.*, 150 Idaho 22, 29, 244 P.3d 166, 173 (2010). The Court noted that

> Taco Time did not contend that it suffered economic loss because Subcontractor sold it a defective restaurant. The restaurant was not defective property. It did not spontaneously combust. Rather, Taco Time's claim is that Subcontractor's negligence in connecting the signs to electrical power caused a fire that extensively damaged the restaurant and its contents. In this case, there was no defective property which was the subject of the transaction.

*Id.* at 26, 244 P.3d at 170. Unlike in *Brian & Christie* where the subject of the transaction was the rendition of negligent subcontractor services that caused damage to the restaurant, the subject of the transaction in this case was a contract to transfer (defective) property that was ultimately damaged by an existing landslide.[29] The distinction is that the economic loss rule "does not

---

[29] BrunoBuilt asserts that the "City's failure to fulfill its statutory duties, i.e. a service, caused the damage to the Home." It argues that Terra Nativa's negligent development of the subdivision "caused the damage to the Home." However, both of these arguments ignore that it was the landslide that in fact caused damage to the Dempsey home

**EXHIBIT "A"**

apply in cases involving the negligent rendition of services because such cases do not involve the purchase of defective property." *Id.* at 27, 244 P.3d at 171.  Here, BrunoBuilt entered into a Contract to construct a home for the Dempseys and obtained title to the lot as a consequence of the agreement.  To that end, the cases of *Tusch* and *Blahd* are directly on point.

In *Tusch*, a buyer sued the seller and builder of three duplexes they purchased seeking compensation for structural defects to the duplexes.  The Supreme Court held that the negligence claims against the seller and the builder were barred by the economic loss rule, because the only damages alleged were lost rental income and property damage to the duplexes and parking lot. *Tusch Enterprises v. Coffin*, 113 Idaho 37, 40–41, 740 P.2d 1022, 1025–26 (1987).

In *Blahd*, the plaintiffs filed a negligence suit against a developer and engineering firms for damage caused by the ground settling under the house they had purchased.  The Supreme Court held that the plaintiffs' claims were barred under the economic loss rule.

> Like the duplex in *Tusch Enterprises*, the Blahds' house is damaged because the foundation is settling. The damage to the Blahds' house is similar to the duplex damage in *Tusch Enterprises*, where this Court held the losses were economic. The Blahds seek to distinguish their case by noting the buyer in *Tusch Enterprises* did not sue the contractor who leveled the lot and did not allege the property had been leveled negligently. The fact that the buyer in *Tusch Enterprises* only sued the builder and the seller is immaterial. It is the subject of the transaction that determines whether a loss is property damage or economic loss, not the status of the party being sued. The Blahds purchased the house and lot as an integrated whole. Like the leveled lot and duplex in *Tusch Enterprises*, the subject of the transaction in this case is both the lot and the house. That being the case, the damages to the Blahds' house are purely economic and the Blahds' negligence claims against the Smith Entities and Jones are barred by the economic loss rule.

*Blahd v. Richard B. Smith, Inc.*, 141 Idaho 296, 300–01, 108 P.3d 996, 1000–01 (2005).

---

and lot.  BrunoBuilt did not argue on summary judgment that any of the Defendants caused the landslide, which in turn damaged the home and lot.

**EXHIBIT "A"**

In finding that BrunoBuilt was barred by the economic loss rule from suing various engineers for

negligence, Judge Hippler noted in the Kleinfelder case that

> the Construction Contract was for the sale of the constructed improvements—the home—on Lot l6. Therefore, not only was Lot 16 itself the subject of the transaction, so too were the subsequent improvements. In a sense, the case is no different than *Blahd* and *Tusch* except that, rather than purchase the lot and already-built improvements as an integrated whole, BrunoBuilt "purchased" the lot and improvements to-be-built with an agreement to then sell the lot and home to the Dempseys.[30]

BrunoBuilt urges the Court to instead follow the holding of Judge Moody in the Seracati Case.

However, the Court declines to do so.  In that case, Judge Moody held the economic loss rule did

not bar the homeowners' negligence claims because the homeowners did not purchase defective

houses, rather they first purchased their lots and later built homes on those lots.[31]  Here, it is

undisputed that BrunoBuilt did not acquire title to the lot and sit on it.  Instead, the subject of the

transaction was the Construction Contract between it and the Dempseys, pursuant to which

BrunoBuilt acquired title to the property in order to build the home.   This case is not

fundamentally factually distinguishable from *Tusch* and *Blahd*.   As in *Blahd*, BrunoBuilt

purchased the lot and the home to-be-built as an integrated whole.   Accordingly, the subject of

the transaction was the sale of defective property.

Whether damages in a defective property case qualify as an economic loss turns on the subject

matter of the transaction.  *Blahd*, 141 Idaho at 301, 108 P.3d at 1001.  Here, the underlying

transaction is the Construction Contract between BrunoBuilt and the Dempseys for the

construction of a home.  As against the City and Terra Nativa, BrunoBuilt alleges that it has

---

[30] Ada County Case No. CV01-16-22915, Mem. Decision and Order on Motions for Summ. J., to Strike and for Relief under 56(d), p. 21 (filed May 22, 2018).
[31] Ada County Case No. CV-OC-2016-9068, Order Denying Def. Kleinfelder's Mot. for Summ. J., p. 10 (filed June 14, 2017).  The Court takes judicial notice of this decision.

**EXHIBIT "A"**

suffered damages in the form of increased costs of construction, including additional testing and inspection, increased interest costs, and the cost of constructing a retaining wall.  It also alleges damages for the lost market value of the Dempsey lot and home.  "Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use."  *Salmon Rivers Sportsman Camps, Inc.*, 97 Idaho at 351, 544 P.2d at 309.  BrunoBuilt's damages fall squarely within the economic loss rule as they are within the subject matter of the Construction Contract. *See also Stapleton*, 153 Idaho 735, 743, 291 P.3d 418, 426 (2012) (finding the cost to drill a new well in order to replace the one that caved in; the need to destroy existing landscaping in order to drill the new well; the cost to purchase water due to the loss of use of the well; and expenses incurred to travel to and stay at his property while the new well was being constructed were not damages resulting from property damage but were economic losses under the economic loss rule).

Accordingly, the Court finds that BrunoBuilt's negligence claims against both the City and Terra Nativa are barred by the economic loss rule and summary judgment is granted in their favor.[32]

### (2) The Dempseys breached the Construction Contract.

BrunoBuilt argues it is entitled to summary judgment against the Dempseys, because (1) the Dempseys assumed the risk of unforeseen site and adverse soil conditions under the plain language of the Contract, (2) the Contract contains a force majeure clause which shifts the risk of

---

[32] Because this conclusion is dispositive of the claims against the City and Terra Nativa, the Court will not address the remaining theories advanced by the parties on summary judgment.

**EXHIBIT "A"**

loss to the Dempseys, (3) the Dempseys wrongfully repudiated the Contract, and (4) BrunoBuilt is entitled to attorney fees.[33]

The Dempseys assert they are entitled to summary judgment because, (1) their performance under the contract is excused by BrunoBuilt's material breaches of the contract (i.e. failure to maintain insurance and submit change orders), (2) BrunoBuilt has not performed its obligations under the contract which are a condition precedent to the Dempseys' duty to make payment, (3) the burden of risk associated with damage from the landslide has not shifted from BrunoBuilt to the Dempseys, and (4) the Dempseys are excused from performance under the doctrine of frustration of purpose.

### a.  The Dempseys are responsible for damages related to the landslide under the plain and unambiguous terms of the Contract.

The main issue presented by the parties' motions is who is responsible for damages related to the landslide that damaged the Dempsey home and lot.

"The plain language of a contract, if unambiguous, is controlling." *Steel Farms, Inc. v. Croft & Reed, Inc.*, 154 Idaho 259, 266, 297 P.3d 222, 229 (2012). The Court will enforce the language of a contract where that language is plain and unambiguous. *Id.* at 266, 297 P.3d at 229. "For a contract term to be ambiguous, there must be at least two different reasonable interpretations of the term, or it must be nonsensical." *Swanson v. Beco Const. Co.*, 145 Idaho 59, 62, 175 P.3d 748, 751 (2007) (citations omitted). "[A] party's subjective intent is immaterial to the interpretation of the contract. Instead, courts will give full 'force and effect to the words of the

---

[33] The Court will not address attorney fees at this time.

**EXHIBIT "A"**

contract without regard to what the parties of the contract thought it meant or what they actually intended it to mean.'"  *Phillips v. Gomez*, 162 Idaho 803, 808, 405 P.3d 588, 593 (2017) (citations omitted).

Neither party has asserted that the Contract language is ambiguous.  Indeed, the plain language of the Contract places the risk on the Dempseys for unforeseen damages, such as from a landslide.  The Contract provided that

> 5.3 <u>Concealed Conditions</u>. Should Contractor encounter concealed or unknown physical conditions below the surface of the ground differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Contract, the Price and Construction Schedule shall be equitably adjusted by change order upon claim by either party made within a reasonable time after the first observance of such conditions. Contractor shall not be responsible for any damages suffered by Owner as a result of any unforeseen soil conditions at the Property.

The Dempseys assert that since BrunoBuilt was the legal owner of the property, the last sentence in the above provision does not make them responsible for "unforeseen soil conditions." However, the Contract plainly identifies the Dempseys as "Owner" and BrunoBuilt as "Contractor." The Recitals make clear that the purpose of the Contract was for the construction of a single family home "pursuant to the terms and conditions" of the Contract. The parties quitclaimed the property to BrunoBuilt only to obtain financing for the construction of the Dempsey home. The fact that BrunoBuilt was the owner in reality is irrelevant given the plain terms of the Contract that defined the Dempseys as the "Owner."[34]  As such, Section 5.3

---

[34] The Dempseys advanced an argument in their Reply Memorandum that they did not acquire equitable title to the lot and that BrunoBuilt bears the risk of loss as the legal owner of the property.  As stated by the Supreme Court in *Holscher v. James*, "The doctrine of equitable conversion applies only if 'nothing in the contract states otherwise.' Thus, equitable conversion does not apply if the effect would be to shift the risk of loss to a buyer contrary to the terms of the parties' agreement."  *Holscher v. James*, 124 Idaho 443, 446, 860 P.2d 646, 649 (1993) (citations omitted).  Here, the Contract unambiguously identifies the Dempseys as the "Owner" and they agreed to be responsible for damages related to unforeseen soil conditions on the Property.  Accordingly, the doctrine of equitable conversion does not apply.

**EXHIBIT "A"**

mandates that BrunoBuilt is not responsible for any damages suffered by the Dempseys as a result of any unforeseen soil conditions at the Property.  The parties do not dispute that the landslide constituted an "unforeseen soil condition."

Section 5.4 required the Dempseys to pay for the cost of "[a]ny reasonable expenses incurred by [BrunoBuilt] in connection with, without limitation, any unusual and/or unforeseen erosion and/or erosion control issues; grading, cut and/or fill issues, soil and/or soil compaction issues; geology and/or rock conditions, hydrologic issues; and/or civil engineering issues or on and about the Property[.]"  Both Sections 5.3 and 5.4 place the burden on the Dempseys to pay for additional costs related to unforeseen soil conditions.

The Contract also contains a force majeure clause, which excuses BrunoBuilt's performance under the Contract for a variety of circumstances beyond BrunoBuilt's control:

> 7.1 Contractor shall be excused from further performance under this Contract as a consequence of any delays or defaults under this Contract unavoidably caused by the act of any governmental authority, the act of any public enemy, acts of God, nature, weather, war, war defense conditions, strikes, walkouts or other causes beyond the control of Contractor. Contractor shall use best efforts to avoid any such delay or default and shall resume performance under this Contract immediately following any such delay or default, but only if such default or delay does not continue for a period of thirty (30) days or more. If such default or delay does continue for a period of greater than of thirty (30) days, Contractor may declare this Contract terminated. **If Contractor's performance is excused hereunder, Owner shall pay to Contractor that portion of the Price earned prior to the onset of the default or delay within ten (10) days of the date performance is excused.**

(Emphasis added.)  "Interpretation and legal effect of an unambiguous contract are questions of law over which this Court exercises free review. In construing a written instrument, this Court must consider it as whole and give meaning to all provisions of the writing to the extent

**EXHIBIT "A"**

possible." *Burns Concrete, Inc. v. Teton Cty.*, 161 Idaho 117, 120, 384 P.3d 364, 367 (2016) (citation omitted) (finding force majeure provision, which included the words "or any other act of force majeure or action beyond Developer's control," was unambiguous and included the failure of the County to give zoning approval for a building).

Here, the landslide was an event of nature beyond BrunoBuilt's control that indisputably caused a delay or default under the Contract. Under the plain terms of the Contract, BrunoBuilt's performance is therefore excused. The permissive language states that BrunoBuilt "may" declare the Contract terminated; however, in reality, the Dempseys declared the Contract terminated. Under Section 7.1 the Dempseys are required to pay "that portion of the Price earned prior to the onset of the default or delay within ten (10) days of the date performance is excused." The requirement that the Dempseys pay BrunoBuilt is conditioned only on a finding that BrunoBuilt's performance was "excused," which under the plain terms of the Contract, it was. It is undisputed that the Dempseys repudiated the Contract and failed to make any further payments to BrunoBuilt after July of 2016.[35]

---

[35] The Supreme Court has defined an anticipatory breach of contract as "a repudiation [by the promisor] of his contractual duty before the time fixed in the contract for his performance has arrived." *STC, Inc. v. City of Billings*, 168 Mont. 364, 543 P.2d 374, 377 (1975).

> An essential element of a true anticipatory breach of a contract is that the repudiation or renunciation by the promisor occur before his performance is due under the contract. Where a party bound by an executory contract repudiates or renounces his obligation before the time for performance, the promisee has, according to the great weight of authority, an option to treat the contract as ended, as far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach, repudiation, or renunciation, even in the absence from the contract of a specific provision authorizing the maintenance of an action or the declaring of a forfeiture.

*Foley v. Munio*, 105 Idaho 309, 311–12, 669 P.2d 198, 200–01 (1983) (citation omitted).

**EXHIBIT "A"**

Accordingly, the Court finds under the plain and unambiguous terms of the Contract, the Dempseys agreed that they would be responsible for unforeseen soil conditions (such as a landslide) and they agreed that BrunoBuilt would be excused from performance if a force majeure event occurred.  The Dempseys further agreed that, if a force majeure event occurred, they would pay BrunoBuilt for "that portion of the Price earned prior to the onset of the default or delay."  There is no genuine issue of material fact that the landslide was a force majeure event. The next issue is whether the Dempseys' performance under the Contract is excused.

### b.  The Dempseys are not excused from performance.

The Dempseys argue that their performance under the Contract is excused because BrunoBuilt failed to maintain insurance on the property, obtain change orders for work related to the landslide, and failed to achieve substantial completion of the house.

### i.  Insurance

Section 8.5 of the Contract provides:

> Upon reasonable advance written notice, and subject to Section V, above, Contractor shall make reasonable efforts to meet the requirements imposed by Contractor's construction lender ("Lender"), if any, and abide by all revisions, changes or modifications reasonably requested by Lender on Owner's behalf, in writing, in connection with the Project.

Section 13 of the Deed of Trust between Banner Bank and BrunoBuilt required BrunoBuilt to "maintain insurance, with premiums prepaid, on all of the Property, against loss, fire, and other hazards, casualties, and contingencies[.]"

**EXHIBIT "A"**

Neither the Construction Contract, nor the Deed of Trust, required BrunoBuilt to obtain landslide insurance.  The Construction Contract did not even require BrunoBuilt to maintain insurance.  Instead, the plain language merely required BrunoBuilt to "make *reasonable efforts* to meet the requirements" imposed by its lender, Banner Bank.  The undisputed evidence is that the lapse in insurance coverage on the Dempsey home was an inadvertent error that once discovered was remedied by BrunoBuilt.  Bruno provided unrebutted testimony that Banner Bank did not require BrunoBuilt to obtain landslide coverage.  Accordingly, the Court does not find that BrunoBuilt breached the terms of the Construction Contract by failing to maintain landslide insurance as it was not required by the Contract, the Deed of Trust, or by the lender.

### ii.  Substantial Completion & Change Orders

The Dempseys argue that their performance under the Contract was not due, because BrunoBuilt failed to achieve substantial completion of the project or declare the Contract terminated under the force majeure provision.  They also contend that BrunoBuilt breached the Contract by failing to issue change orders for work related to the landslide.  They assert that they notified BrunoBuilt that they would not make a final payment on the property because it became apparent that BrunoBuilt would never be able to fulfill its duties under the Contract.  "Delays and change orders were futile. No delay would be sufficient and no change order effective to allow BrunoBuilt to make the home safe, to obtain a C.O., and thereby to substantially complete the Project."[36]

---

[36] Reply in Supp. of Dempseys' Mot. for Summ. J. p. 3 (filed July 16, 2019).

**EXHIBIT "A"**

BrunoBuilt contends this argument is nonsensical given the Dempseys repudiated the Contract on July 18, 2016, by emailing Bruno stating that they would not continue forward with purchasing the home and that BrunoBuilt had no duty to continue its obligations once the Dempseys repudiated the Contract.

While Section 4.4 of the Contract governs final payment upon substantial completion of the home, Section 7.1 covers the facts in this case given that a force majeure event occurred prior to substantial completion of the home.  Section 7.1 allows BrunoBuilt to recover "that portion of the Price earned prior to the onset of the default or delay within ten (10) days of the date performance is excused."  The fact that BrunoBuilt did not declare the Contract terminated before the Dempseys anticipatorily breached the Contract is irrelevant.  Section 7.1 is permissive in that it states, "Contractor *may* declare this Contract terminated."  (Emphasis added.)  It is undisputed that the Dempseys terminated the Contract by notifying BrunoBuilt that it would not make payment on the house or continue working with BrunoBuilt to achieve completion of the home.  Section 7.1 specifies that BrunoBuilt's performance is excused for "any delays or defaults . . .  unavoidably caused by the act of . . . nature . . . or other causes beyond the control of" BrunoBuilt.  "In the absence of ambiguity, a document must be construed by the meaning derived from the plain wording of the instrument."  *Phillips v. Gomez*, 162 Idaho 803, 809, 405 P.3d 588, 594 (2017) (citation omitted).  Here, the Contract is free from conflicting interpretations by reasonable persons.  The plain and unambiguous terms of the Contract mandated that the Dempseys were responsible for unforeseen events (such as the landslide) that occurred during the construction of their home, regardless of whether BrunoBuilt had achieved substantial completion on the home.

**EXHIBIT "A"**

Section 7.1 is also unaffected by other Sections in the Contract which address change orders. Indeed, even the Dempseys recognized in their reply briefing that under the circumstances in this case, "[d]elays and change orders were futile." Therefore, the Dempseys argument that BrunoBuilt breached the Contract by failing to issue a change order is unavailing. Section 7.1 did not require BrunoBuilt to issue a change order if a force majeure event occurred.

### c.   The Dempseys are not excused under the doctrine of frustration of purpose.

The Dempseys also assert that they are excused from performance under the doctrine of frustration of purpose.

The doctrine of frustration of purpose

> operates in a proper situation to excuse a promisor's duty of performance if some supervening event has destroyed the value of the counter-performance bargained for by the promisor, even though the counter-performance is still literally possible. Thus, in the leading case of *Krell v. Henry*, a frustration defense excused a promisor's duty to pay seventy-five pounds rent for a balcony hired for use in viewing a coronation procession, the procession having been cancelled when the king became ill.

*Twin Harbors Lumber Co. v. Carrico*, 92 Idaho 343, 348, 442 P.2d 753, 758 (1968) (citations omitted); *see also* Restatement (Second) of Contracts § 265 (1981) ("Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."). Although the Idaho Supreme Court has not thoroughly addressed the doctrine, other courts note that the frustration must be substantial, or "so severe that it is not fairly to be regarded as within the risks that he assumed under the contract." *See In*

**EXHIBIT "A"**

*re Acceptance Ins. Companies Inc.*, 567 F.3d 369, 382 (8th Cir. 2009); *Downing v. Stiles*, 635 P.2d 808, 814 (Wyo. 1981); *Stormont v. Astoria Ltd.*, 889 P.2d 1059, 1063 n. 7 (Alaska 1995). "The doctrine does not apply where the risk of the event that has supervened to cause the alleged frustration was reasonably foreseeable and could and should have been anticipated by the parties and provision made for it in the agreement." 17A Am. Jur. 2d Contracts § 638.

Here, the parties entered into an agreement that accounted for circumstances beyond the parties' control – such as a landslide. The cases (and the Restatement) interpreting the frustration of purpose doctrine clearly find that if the language of the contract provides for the event that occurred, then the doctrine does not apply to excuse a party's performance under the Contract. Here, the landslide was a foreseen event and was accounted for in the Contract under Section 5.3, 5.4 and 7.1. The language in these provisions unambiguously placed the risk on the Dempseys for unforeseen soil conditions. The force majeure provision excused BrunoBuilt's performance for delays or defaults unavoidably caused by nature or other causes beyond the control of BrunoBuilt and required the Dempseys to pay "that portion of the Price earned prior to the onset of the default or delay[.]"

The Court concludes there is no genuine issue of material fact that the Dempseys breached the Construction Contract and they do not have a viable defense for their breach. Therefore, BrunoBuilt is entitled to summary judgment and the Dempseys are not.

**EXHIBIT "A"**

## CONCLUSION

For the reasons set forth herein, BrunoBuilt, Terra Nativa, and the City's Motions for Summary

Judgment are GRANTED.  The Dempseys' Motion for Summary Judgment is DENIED.


IT IS SO ORDERED.


Signed: 8/26/2019 12:14 PM

_____

SAMUEL A. HOAGLAND                                    Date
District Judge

**EXHIBIT "A"**

## CERTIFICATE OF MAILING

I hereby certify that on ___Signed: 8/26/2019 12:53 PM___, I served a true and correct copy of the within

instrument to:

Rick Stacey
Chad Nicholson
Gary Greenlee
Joseph Wager
stacey@mwsslawyers.com
nicholson@mwsslawyers.com
greenlee@mwsslawyers.com
wager@mwsslawyers.com

Donald Farley
Andrew LaPorta
djf@powersfarley.com
ajl@powersfarley.com
contact@powersfarley.com

Scott Muir
smuir@cityofboise.org
boca@cityofboise.org

Terry Copple
Michael Band
tc@davisoncopple.com
band@davisoncopple.com


Phil McGrane
Clerk of the District Court

By _____
Deputy Court Clerk

EXHIBIT "A"

Filed: 09/18/2019 15:31:23
Fourth Judicial District, Ada County
Phil McGrane, Clerk of the Court
By: Deputy Clerk - Hoskins, Janet

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR ADA COUNTY

| | |
|---|---|
| BRUNOBUILT, INC., an Idaho corporation,<br>Plaintiff,<br><br>vs.<br><br>WILLIAM DEMPSEY and AMY DEMPSEY,<br>husband and wife; CITY OF BOISE, a<br>municipal corporation; TERRA NATIVA,<br>LLP, an Idaho limited liability partnership,<br>Defendants. | Case No. CV01-17-23686<br><br>ORDER STAYING PROCEEDINGS |

IT IS HEREBY ORDERED that all pending motions are DENIED without prejudice, and all

further proceedings are hereby STAYED until further notice due to Defendants' William and

Amy Dempsey's filing of bankruptcy on September 17, 2019.

IT IS SO ORDERED.

_____          Signed: 9/18/2019 02:47 PM
SAMUEL A. HOAGLAND                                        Date
District Judge

**EXHIBIT "B"**

## CERTIFICATE OF MAILING

I hereby certify that on ___Signed: 9/18/2019 03:31 PM___, I served a true and correct copy of the within

instrument to:

Rick Stacey
Chad Nicholson
Gary Greenlee
Joseph Wager
stacey@mwsslawyers.com
nicholson@mwsslawyers.com
greenlee@mwsslawyers.com
wager@mwsslawyers.com

Donald Farley
Andrew LaPorta
djf@powersfarley.com
ajl@powersfarley.com
contact@powersfarley.com

Scott Muir
smuir@cityofboise.org
boca@cityofboise.org

Terry Copple
Michael Band
tc@davisoncopple.com
band@davisoncopple.com

Phil McGrane
Clerk of the District Court

By _____
Deputy Court Clerk

EXHIBIT "B"